| | |
|---|---|
| SAMEER EASSA, | |
| Plaintiff, | |
| v. | No. 17 CV 812 |
| | Judge Manish S. Shah |
| MEGAN J. BRENNAN, Postmaster General of the United States Postal Service, | |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Sameer Eassa, a Muslim Arab-American, was removed from his position at the Postal Service twice: the first time after two eyewitnesses reported that he made threatening gestures at another employee while taunting that employee and calling him the N-word, and the second time after Eassa exceeded the maximum allowable amount of sick leave during a 90-day period. Eassa alleges that he was removed because of his race, religion, and protected activity. He cites racist and religiously biased comments made three years earlier by two people involved with one of his removals, three other employees that he says engaged in similar conduct but were treated preferentially, and various shortcomings in the investigation of the two eyewitness's reports. He also alleges that discriminatory animus motivated various other harms he suffered. Defendant Megan J. Brennan, as Postmaster General of the United States Postal Service, moves for summary judgment on all of Eassa's claims.

## I. Legal Standards

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party must show that, after "construing all facts, and drawing all reasonable inferences from those facts, in favor of the non-moving party," *United States v. P.H. Glatfelter Co.*, 768 F.3d 662, 668 (7th Cir. 2014), a reasonable jury could not return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party is also entitled to summary judgment when the nonmoving party fails to make a sufficient showing on an essential element of his case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## II. Facts

### A. 2016 Emergency Placement & Removal

Eassa was a driver for the United States Postal Service. [41] ¶¶ 3, 8.[1] He filed complaints with the Postal Service's Equal Employment Opportunity office dating back to 2010. [41] ¶ 7; [46] ¶ 1; [42-2] at 5. In 2016, Matt Minnifield (another driver) reported to Lewis Keys (a supervisor) that he saw Eassa drive up to Allen Ferguson (also a driver) in the employee parking lot of the Carol Stream Postal Service facility and "flip" Ferguson the middle finger while repeatedly saying the N-word and "come

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, and in the case of citations to depositions that were attached as exhibits to the Local Rule 56.1 statements, the deposition transcript's original page number and line citations have been added. The facts are largely taken from Eassa's response to Brennan's Local Rule 56.1 statement, [41], and Brennan's response to Eassa's Local Rule 56.1 statement, [46], where both the asserted fact and the opposing party's response are set forth in one document.

on." [41] ¶ 14. Minnifield reported that he was afraid Eassa was going to "go after" Ferguson, *id.*, and that Eassa had used the N-word at work in the past. [37] at 147. Ferguson confirmed that Eassa had yelled racial slurs at him in an intimidating and threatening manner. [41] ¶ 15. Eassa denies these allegations. [41] ¶¶ 14–15; [46] ¶¶ 9–11.

Ruben Garcia was the transportation manager for the Carol Stream facility. [41] ¶ 8. Garcia used to drive the same shift with Eassa at the Irving Park facility several years earlier. *Id.* He knew about Eassa's previous equal-opportunity-related complaints, [46] ¶ 2, but said that he did not know Eassa's race or religion. [37] at 42, 19:7–11; at 76, 156:15–16. Garcia oversaw Keys, Frank Cintula (another supervisor), and Danielle Cobbins (a driver attendance supervisor). [41] ¶¶ 9, 38. Keys believed that Eassa was Palestinian, [46] ¶ 4, and was aware of Eassa's prior equal-opportunity-related complaints, too. [41] ¶ 13. Cobbins said that she did not know Eassa's race or religion or whether Eassa had engaged in prior protected activity. [37] at 205.

Keys primarily conducted the investigation into the parking lot incident, [41] ¶ 16, and, as part of that investigation, asked for and received written statements from both Minnifield and Ferguson. [41] ¶ 18. Postal inspectors interviewed Minnifield, Ferguson, and Eassa. [41] ¶ 19. Garcia was out of town at the time but participated in the investigation remotely. [41] ¶¶ 17, 20–21. About one week after the incident, Garcia spoke to Eassa over the phone and Eassa told him that another driver (Nick Estrada Jr.) would vouch for Eassa's version of what happened. [41] ¶ 21.

Garcia questioned the absence of a written statement from Estrada and wondered why Eassa had waited eight days before mentioning Estrada. *Id.* The next day, Garcia wrote an email to Cintula, Keys, and Leroy Hein (acting transportation security manager) saying that he did not "buy" Eassa's story about Estrada Jr. (noting that Eassa had told him that he was speaking to Estrada Jr. on the phone when Ferguson "started going off on him") and that Cintula, Keys, and Hein should "go for removal based on 0 tolerance in the workplace." [37] at 178.

Keys, Hein, and others conducted a pre-disciplinary interview with Eassa. [41] ¶ 23. Eassa had told Garcia that he wanted either Garcia or Mike Kotula (plant manager) present during the meeting, but because Garcia was out of town, Garcia appointed Hein to participate on his behalf. [41] ¶ 20. At the interview, Eassa denied the allegations against him. [41] ¶ 24. Keys did not find Eassa credible because two witnesses' accounts contradicted Eassa's and because Eassa had been involved in prior altercations at work. *Id.* Citing the Postal Service's zero-tolerance policy ("[t]hreats or assaults made directly or indirectly toward any employee or postal customer, even in jest, will not be tolerated," [37] at 180), Keys, Garcia, and the Postal Service's labor relations department put Eassa on "emergency placement." [41] ¶¶ 25, 27. The parties dispute whether, before participating in the decision to recommend removal, Garcia ever saw Minnifield's statement (or was made aware of its contents), *see* [46] ¶ 18, and whether Garcia ever considered Estrada's statement. [46] ¶ 19.

After putting Eassa on emergency placement, Garcia posted Eassa's picture around the Carol Stream facility, along with a statement: "THIS EMPLOYEE'S

ACCESS HAS BEEN REVOKED[.] PLEASE DO NOT ALLOW ACCESS INTO THE FACILITY[.]" [46] ¶ 21; [42-5].

Garcia, Keys, and the Postal Service's labor relations department issued Eassa a notice of removal. [41] ¶ 32. Eassa filed a timely charge of discrimination with the Postal Service's Equal Employment Opportunity office. [41] ¶ 34. About a year later, Eassa's removal was modified and became a long-term suspension under the terms of a settled union grievance, and Eassa returned to work. [41] ¶ 37; [37] at 203. Tim Markland (a representative of the United States Postal Service) and William Pouncy (a leave control manager) signed off on Eassa's return to work. [37] at 201, 203; [41] ¶ 39. *See also* [37] at 64, 108:24–109:7 (Garcia testified that he had no input on the decision to reinstate Eassa).

Eassa has written statements from both Estrada and another driver, James Oden. *See* [41] ¶¶ 29–30; [37] at 186, 189. Oden signed a statement claiming that he was present during the parking lot incident and that "no interaction" took place between Eassa and Ferguson. [41] ¶ 29; [37] at 186. Estrada signed a statement claiming that Minnifield could not have seen the incident because of where Minnifield's car was parked. [41] ¶ 30; [37] at 189. Garcia testified that he saw Estrada's statement at some point after the decision to remove Eassa, *see* [37] at 45, 30:24–32:6, and Keys testified that he did not see either Oden's or Estrada's statement during the investigation. *See* [41] ¶¶ 29–30.

Garcia used to call Eassa a "terrorist" when they drove together at Irving Park, [46] ¶ 3, but Eassa took the comments to be a "good-natured joke." [37] at 31, 58:19–

59:1. In 2014, a former union representative signed a letter claiming that at a forum held in 2013, he heard Keys say to Eassa, "your kind has no respect for women." [41] ¶ 35; [37] at 197. The forum was about "a complaint lodged on the agency by Mr. Sameer Eassa." [37] at 197. Eassa confirmed that he heard the comment, and Keys denies making it. [41] ¶ 35.

A few months after his return to work in 2017, Eassa and Ferguson had a disagreement and Ferguson made a "crotch-grabbing" gesture. [41] ¶ 57. Both Eassa and another Postal Service employee submitted written statements about the argument. [46] ¶ 26. Eassa alleges that Garcia never investigated the report, *id.*, but Eassa submitted his complaint to Cintula, not Garcia, *see* [37] at 124, 48:11–13, and Cintula later sent an email describing the investigation that he carried out. *See* [46] ¶ 26; at 15–20. Ferguson was never disciplined. [46] ¶ 26.

Eassa also says that a white Postal Service employee at a different facility (Frank Milici) called a black employee (Irvin Cunningham) the N-word and that a fight ensued. [41] ¶ 59. Eassa does not know whether the Postal Service made any findings about who instigated the fight, but testified that both Milici and Cunningham were returned to work after two and a half months with backpay. [41] ¶ 59; [46] ¶ 23. Eassa has submitted no evidence identifying who was involved in the decision to award Milici backpay or to allow him to return to work, and Eassa is not aware of anyone else at the Carol Stream facility who called a coworker the N-word and was not fired for it. [41] ¶ 61.

Lastly, Eassa says that Shirley Miller (a mail processor and secretary) attacked him in either 2013 or 2014, and that both Miller and Eassa were put on emergency placement in response. [41] ¶ 60; [37] at 19, 12:16. Eassa says that Keys adjusted Miller's time card to show that she had finished her shift, [41] ¶ 60, and that Miller's picture was never posted around the facility even though she had to be escorted out of her manager's office. [46] ¶ 23.

## B.    2017 Removal

Eassa took 104 hours of unscheduled sick leave in the summer of 2017, which exceeded the maximum allowable amount during a 90-day period. [41] ¶ 41. Eassa admits that he exceeded the limit, *id.*, but says that he called the Postal Service and explained the reasons for his absence, in accordance with protocol. [46] ¶ 28. Eassa regularly took time off for religious holidays. [46] ¶ 4.

Cobbins, the driver attendance supervisor, noticed Eassa's attendance and attempted unsuccessfully to meet with him to discuss the issue. [41] ¶¶ 38, 43. A week later, Eassa submitted his complaint about Ferguson and the crotch-grabbing gesture. [37] at 236. The next day, Eassa initially refused an instruction that he attend a meeting with Cobbins, and then later met with Cobbins and threw away the paperwork she gave him on the way out of her office. [41] ¶¶ 44–45. Cobbins sent Eassa a letter notifying Eassa that a pre-disciplinary interview had been scheduled for the following week. [46] ¶ 27; [37] at 217. Eassa says he never received the letter, [46] ¶¶ 25, 27, and he did not attend the interview. [41] ¶ 46. Cobbins signed a notice of removal informing Eassa that he would be placed on "non-pay" status due to his

failure to maintain a regular schedule. [41] ¶ 47. Pouncy signed as a concurring official. *Id*. Eassa was placed on non-pay status thirty days later. [41] ¶ 50.

Eassa is not aware of any similarly situated employee who was treated differently than him regarding attendance discipline. [41] ¶ 62. In an unsworn statement from June 2016, Thomas Smith claimed that Garcia admitted to setting up Eassa to be removed from his job, because Eassa was "pulling the same things" that he had at the Irving Park facility. [41] ¶ 36.

### C.    Other Alleged Harms

Eassa had to pay $100 out-of-pocket to his doctor at a time when he says he should have been receiving medical insurance. [41] ¶ 54. Eassa was also precluded from participating in an annual bid process (during which the drivers bid on routes and schedules) but cannot identify any other driver at his facility that was allowed to bid after being removed and then reinstated one year later, and admits that he ultimately received the same schedule that he had before his absence. [41] ¶ 55. Before returning to work in April of 2017, Eassa was required to undergo a physical and written exam and driving test. [41] ¶ 53. He was paid for the time he spent on these tasks. *Id*. Lastly, in August of 2017, a note was posted telling Eassa not to clock in without showing medical documentation for one of his recent absences. [41] ¶ 56. Garcia was not aware of similar notes being posted. *Id.*; [37] at 68–69, 124:15–126:1.

### III.    Analysis

Eassa alleges that the Postal Service took adverse employment actions against him because of his race, religion, and protected activity, all in violation of Title VII of the Civil Rights Act. [23] ¶ 1; 42 U.S.C. § 2000e–2(a)(1). He may prove his claims

"either directly or indirectly, and with a combination of direct and circumstantial evidence." *McKinney v. Office of Sheriff of Whitley Cty.,* 866 F.3d 803, 807 (7th Cir. 2017). The inquiry is "simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enterprises, Inc.,* 834 F.3d 760, 765 (7th Cir. 2016).

Eassa may also prove his claim via the burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973); *McKinney*, 866 F.3d at 807; *David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). Under that framework, Eassa carries the initial burden of establishing a prima facie case of discrimination. *McKinney*, 866 F.3d at 807; *McDonnell Douglas,* 411 U.S. at 802. He can accomplish this "by setting forth evidence that: '(1) [he] is a member of a protected class, (2) [his] job performance met [the employer's] legitimate expectations, (3) [he] suffered an adverse employment action, and (4) another similarly situated individual who was not in the protected class was treated more favorably than the plaintiff." *McKinney,* 866 F.3d at 807.

If Eassa makes this showing, the burden shifts to the employer "'to articulate some legitimate, nondiscriminatory reason' for its employment decision." *Id.* If it does so, "the burden shifts back to the plaintiff, who must present evidence that the stated

reason is a 'pretext,' which in turn permits an inference of unlawful discrimination."
*Id.*

A.     **2016 Emergency Placement & Removal**

Under both *Ortiz* and *McDonnell Douglas*, Eassa has failed to produce sufficient evidence from which a reasonable jury could infer that Keys and Garcia took adverse action against him in 2016 because of his race or religion. The Postal Service says Eassa was removed because Eassa hurled racial slurs at another employee in a threatening manner. Eassa has failed to produce evidence of similarly situated comparators being treated preferentially, or other sufficient evidence from which a reasonable jury could conclude that the stated reason for removing him was mere pretext. The failure to do either is fatal to his claim. *Lewis v. Wilkie*, 909 F.3d 858, 871 (7th Cir. 2018).

The Postal Service had a legitimate, non-discriminatory reason to take adverse action against Eassa in 2016. Two eyewitnesses submitted signed statements alleging that Eassa violated the zero-tolerance policy by threatening another employee with a despicable epithet. [41] ¶¶ 14–15; [37] at 145, 147. Eassa was interviewed and provided with an opportunity to deny the allegations against him. [41] ¶ 24. The interviewers believed the eyewitnesses and disbelieved Eassa, in part because of Eassa's prior altercations at work. [41] ¶¶ 24–27. Eassa was eventually put on emergency placement because of his "threatening conduct and comments towards another employee." [37] at 184.

There are two written statements in the record giving reason to doubt the conclusion of the investigation, *see* [37] at 186; 189, and, taking the facts in the light

most favorable to Eassa, Garcia was aware of at least one of those statements before making the decision to terminate Eassa. *See* [37] at 56, 74:19–75:24. Keys could have been aware of that same statement through Garcia. *See* [41] ¶ 30; [46] ¶ 20. Both cast doubt on Minnifield's and Ferguson's versions of the events. But they are not dispositive. Eassa initially told Garcia that Estrada Jr. was on the phone with him "when Ferguson started going off on him," *see* [37] at 178, and yet Oden's statement asserted there was "no interaction" at all between Eassa and Ferguson. [37] at 186. Estrada Jr.'s statement is at most evidence of where Eassa's and Minnifield's cars were parked at some point before the interaction took place, which is of little use in contradicting Minnifield, who says that Eassa had already driven his car a ways towards Ferguson by the time the interaction took place. *See* [37] at 145; 189. These statements might give an investigator a reason to disbelieve Minnifield and Ferguson, but they do not require such a finding. Even in the light most favorable to Eassa, given their inconsistencies and how little light they shed on Garcia's and Keys's motivations, the statements do not permit an inference that a proscribed factor caused the adverse employment action.

Eassa's examples of previous instances of racist and religiously bigoted commentary are too removed in time and context to demonstrate discrimination or overcome the Postal Service's legitimate explanation. "Isolated comments" like Keys's and Garcia's have to be "contemporaneous with the discharge or causally related to the discharge decision making process" to suffice as evidence of discrimination. *See Geier v. Medtronic, Inc.*, 99 F.3d 238, 242 (7th Cir. 1996) (comment made one year

prior to discharge was "not temporally related to [plaintiff's] dismissal," and there was "no causal nexus between the remark and the decision to discharge" in part because the comment was made in "a setting unrelated to discussions . . . which eventually led to [plaintiff's] dismissal"); *Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 724 (7th Cir. 1998) (comment made five months prior to discharge "was not temporally related to her discharge," where comment was made in "casual setting unrelated to discussions regarding the issues which led to plaintiff's dismissal").[2] *But see Lucas v. Chicago Transit Auth.*, 367 F.3d 714, 730 (7th Cir. 2004) ("[i]t is different when the decision makers themselves, or those who provide input into the decision, express such feelings (1) around the time of, and (2) in reference to, the adverse employment action complained of").

Keys allegedly made his statement in February of 2013, more than three years before participating in the decision to put Eassa on emergency placement. [37] at 197; [41] ¶ 35. Garcia allegedly made his comment when he and Eassa were both drivers

<hr>

[2] Both *Geier* and *Kennedy* were decided under the pre-*Ortiz*, "direct method" and "circumstantial evidence" tests. *See Geier*, 99 F.3d at 241–42; *Kennedy*, 140 F.3d at 722–23. *Ortiz* rendered those frameworks obsolete, but causation is still required. *See Ortiz*, 834 F.3d at 765. And there must be more than isolated and remote comments to justify an inference of discrimination. *See e.g., Juarez v. Ameritech Mobile Commc'ns, Inc.*, 957 F.2d 317, 321 (7th Cir. 1992) ( "[t]he timing of the complaints, standing alone, [did] not create a genuine issue as to a causal connection between the filing of [plaintiff's] sexual harassment complaint and her termination almost six months later"); *Fyfe v. City of Fort Wayne*, 241 F.3d 597, 603 (7th Cir. 2001) ("[i]n the absence of any other evidence of a causal link, the 18–month interval in this case is insufficient proof of causation"); *Schuster v. Lucent Technologies, Inc.*, 327 F.3d 569, 576 (7th Cir. 2003) (two remarks, one made five months before and another made one month after adverse employment decision, were properly considered "stray" remarks that were insufficient to raise an issue of material fact); *Dickerson v. Bd. of Trustees of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 602 (7th Cir. 2011) (isolated, non-contemporaneous statement made after filing of complaint with equal employment opportunity commission insufficient to survive motion for summary judgment).

at the Irving Park facility; Eassa left that facility in 2012, meaning Garcia's comments were made even less contemporaneously than Keys's. [41] ¶¶ 8, 27. Keys allegedly made his comment during a forum concerning a different complaint Eassa had lodged, [37] at 197, and Garcia allegedly made his at some point while he and Eassa were working together as drivers at a different facility. *See* [37] at 31, 58:17–59:1. Eassa testified that Garcia's comments were "good-natured"; or, in other words, were not even indicative of discriminatory animus at the time they were made. *Id.*; *Shager v. Upjohn Co.*, 913 F.2d 398, 402 (7th Cir. 1990) ("[t]he remark . . . may have had no consequence . . . because it did not motivate even the person uttering it to act on it"). Keys's comment is indicative that he harbored some racial or religiously bigoted animus in 2012, but with the different context, passage of time, and other evidence providing a legitimate reason to remove Eassa (his threat to a co-worker) that animus is not evidence of causation. The comments are part of the picture, but they do not complete a depiction of prohibited employment action.

Also unpersuasive are Eassa's examples of what he says were similarly situated employees being treated differently. There is "no magic formula for determining whether someone is similarly situated," and instead, "courts should apply a 'common-sense' factual inquiry—essentially, are there enough common features between the individuals to allow a meaningful comparison?" *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 405 (7th Cir. 2007), *aff'd*, 553 U.S. 442 (2008). Similarly situated employees should be "directly comparable" to Eassa "in all material respects," but "need not be identical in every conceivable way." *Coleman v.*

*Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012). "Whether a comparator is similarly situated is typically a question for the fact-finder, unless, of course, the plaintiff has no evidence from which a reasonable fact-finder could conclude that the plaintiff met his burden on this issue." *Id.* at 846–47.

Relevant factors for determining whether two employees are similarly situated include "whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications—provided the employer considered these latter factors in making the personnel decision." *David*, 846 F.3d at 226. *See also Humphries,* 474 F.3d at 405 (the similarly situated requirement *"normally* entails a showing that the two employees dealt with the same supervisor" (emphasis in original)).

Eassa cites three examples of similarly situated employees: Frank Milici, Shirley Miller, and Allen Ferguson. *See* [41] ¶¶ 58–62; [46] ¶¶ 23, 26. Milici was a driver, but he worked at a different facility and was not supervised by either Keys or Garcia. [41] ¶ 59. Both Milici and Eassa were put on emergency placement after calling a coworker the N-word, [41] ¶ 27; [46] ¶ 23, and although Milici was allowed to return to work more quickly than Eassa, Eassa had been involved in prior altercations at work, and there is no evidence that Milici had a similar record. *See* [41] ¶ 60; [46] ¶ 23. In any event, Eassa has produced no evidence that Garcia or Keys had any say about when Eassa was allowed to return to work or if he was awarded backpay; Tim Markland and William Pouncy signed those documents. [37] at 201,

203. Garcia and Keys appear to have treated Eassa the same way that Milici's supervisors treated him. One cannot infer discriminatory intent on the part of Garcia or Keys just because the people that dealt with Eassa reached different conclusions than the people that dealt with Milici. There remains a causation gap between prohibited animus and employment action.

Eassa also says that Garcia did not conduct an investigation after Ferguson made a "crotch-grabbing" gesture in September of 2017, despite the submission of a corroborating statement. *See* [46] ¶ 26; [43] at 7. But this is not evidence of Garcia's bias, because a different person, the person to whom Eassa submitted his complaint, conducted an investigation. [37] at 124, 48:11–13; [46] at 15–20. Even if Garcia had conducted the crotch-grabbing investigation, his conduct during that investigation would not have been of much comparative use, given that Keys primarily conducted the investigation of the parking lot incident, [41] ¶ 16, and Garcia only participated remotely via phone. *See* [41] ¶¶ 17–20. And even if there had been a failure to investigate Eassa's claim in 2017, that failure is not indicative of bias given that Ferguson himself levied another complaint about Eassa in 2017, and Eassa has not produced evidence tending to show that the investigation into Ferguson's complaint was any less thorough than that which was made into the crotch-grabbing incident. *See* [37] at 122, 41:1–18; 226. Lastly, there is nothing suspicious about Garcia treating Eassa and Ferguson differently during the investigation of the parking lot incident;

Eassa was the accused and Ferguson, the accuser. They were not similarly situated. *See* [41] ¶¶ 14–15.

Eassa advanced no argument relating to Miller in his response to the Postal Service's motion. *See* [43]. Again, there is no evidence that either Keys or Garcia supervised Miller (other than, perhaps, the implication that Keys was her supervisor because he was able to adjust her timecard). *See* [41] ¶ 60; [46] ¶ 23. Even if Garcia or Keys had supervised her, Eassa has not included any evidence demonstrating that Garcia or Keys knew Miller's race or religion, or that she had previously engaged in protected activity, *see* [41] ¶ 60; [46] ¶ 23, and bias against those who engage in fights at work is not indicative of bias against people protected by Title VII. That distinction is significant enough to render the comparison effectively useless. *Coleman*, 667 F.3d at 846. As for the decision to put Eassa's picture up, Eassa has not identified evidence tending to show that Miller was required to stay away from work long enough to justify the posting of a photo. Or that Garcia had any say in whether a photo of Miller was posted. These differences, too, render the comparison effectively useless. *Id.*

The rest of the evidence Eassa points to in his briefing relates to perceived inadequacies in the investigation of the parking lot incident. *See* [43] at 5–6. Eassa says this evidence "establish[es] motive," or, in other words, that the investigation was a sham and shows discriminatory animus on the part of the decision-makers involved. *See id.*

Not so. First, neither Garcia nor Keys initiated the investigation—Minnifield did. [41] ¶ 14. Eassa might argue that Garcia and Keys were being opportunistic and,

once presented with a chance, conducted the investigation in a discriminatory way. But there is no support for this theory: Eassa was not only given an opportunity to tell his side of the story, he was given two opportunities, the second of which involved an audience that was at least partially the result of Eassa's input. *See* [41] ¶¶ 20, 22–23. Although Garcia may not have asked Eassa if he had any witnesses, [43] at 6; [37] at 178, Eassa has not pointed to evidence tending to show that either Garcia or Keys asked Minnifield or Ferguson for witnesses, either. *See* [41] ¶ 15–27.

Nor is it enough for Eassa to point to evidence that Garcia and Keys ignored statements from witnesses before finalizing the decision to terminate Eassa. *See* [41] ¶¶ 21, 29–30; [46] ¶¶ 10–11, 20. Keys did not know about one of the statements. [41] ¶¶ 29–30. And while Garcia (and therefore Keys) may have known that Estrada was a potential witness, *see* [46] ¶ 20, Garcia testified that he discounted Estrada's statement because Estrada did not even purport to be present for the altercation, [41] ¶ 31, and he would have discounted Oden's statements because Oden was an employee of a different facility and it would have been strange for him to be in the parking lot of the Carol Stream facility at the time. [41] ¶ 31.

A reasonable jury could infer that both Keys and Garcia knew Eassa's race and religion. Keys asserted that he believed Eassa's race to be "Palestinian/Arab," [42-2] at 5, and Garcia said that he was "not sure of [Eassa's] race." *Id.* But Garcia called him a "terrorist" on multiple occasions, [37] at 31, 58:13–18; [43] at 6, and implies that, even if Garcia did not know Eassa's race, he could have found out from Keys.

*See* [43] at 5.[3] With regard to religion, a reasonable jury could infer that Keys and Garcia knew about Eassa's absences on religious holidays and concluded from them that Eassa was Muslim. *See* [46] ¶ 4; [43] at 5.

Still, with the rest of the evidence properly understood, this is not enough. The guiding question is "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz,* 834 F.3d at 765. There is evidence that Garcia and Keys knew Eassa's race and religion and made isolated (and in Garcia's case, "good-natured") racist or religiously bigoted comments unrelated to Eassa's 2016 removal more than three years earlier. But Eassa has failed to identify any similarly situated member of a different race or religious background that was treated preferentially. And the Postal Service's reason for removing him was legitimate; two people say that they saw him "flip" another employee the middle finger while repeatedly saying the N-word and "come on" at that employee. [41] ¶ 14. Threatening gestures are prohibited under the Postal Service's zero-tolerance policy. [37] at 180. Eassa's evidence is not like the kind of evidence that has been found sufficient in other cases. *See, e.g., McKinney*, 866 F.3d at 813 (evidence "easily" supported a finding that plaintiff was fired because of his race where evidence showed "officers and supervisors made inappropriate racial remarks to him; he was socially ostracized; supervisors failed to train him adequately; he was fired for conduct that

---

[3] Eassa argued that Oden's statement indicated that Garcia made "crude and racist comments about [Eassa]." [43] at 5. This is not correct. Oden's statement attributes the comments to Ferguson, not Garcia. [42-4].

supervisors expressly authorized . . . ; he was treated more harshly than other employees for the same conduct . . . ; he was penalized for violating standard operating procedures that either did not exist or that he did not in fact violate . . .”). Eassa has no comparators, no evidence that the decisionmakers did not genuinely believe that he violated the zero-tolerance policy, and at most untimely and isolated comments. Even when taken together, as a whole, a reasonable jury could not conclude from this evidence that Eassa’s race or religion caused the removal that followed his conduct in the parking lot.

Eassa’s argument also fails under the alternative burden-shifting framework described in *McDonnell Douglas*, 411 U.S. at 802–03. As discussed above, he has failed to identify a similarly situated employee and that means he has not made out a prima facie case for discrimination.

Even if Eassa could make this showing, the burden shifts to the Postal Service “‘to articulate some legitimate, nondiscriminatory reason’ for its employment decision.” *Id.* at 807. *See also Texas Dep’t of Cmty. Affairs v. Burdine,* 450 U.S. 248, 257 (1981) (“the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus”). It has. According to two eyewitness accounts, Eassa drove up to Ferguson in the employee parking lot and “flipped” him the middle finger while repeatedly saying the N-word. [41] ¶ 14. That is more than enough to justify removal, especially where a zero-tolerance policy was in place. *See Timm v. Mead Corp.*, 32 F.3d 273, 275 (7th Cir. 1994) (for a reason to be legitimate, it need

only be nondiscriminatory and, if true, merely explain why the challenged action was taken).

Having shown that there was a legitimate reason, the burden shifts back to Eassa, who must present evidence that the stated reason is a pretext. *McDonnell*, 411 U.S. at. 802. "[P]retext 'involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] lie, specifically a phony reason for some action." *Ennin v. CNH Indus. Am., LLC,* 878 F.3d 590, 596 (7th Cir. 2017). "[T]he question is whether the employer honestly believed its proffered reason for discharge." *Essex v. United Parcel Serv., Inc.*, 111 F.3d 1304, 1310 (7th Cir. 1997). Eassa can show that the proffered reasons for terminating him were pretextual by showing that "(1) the proffered reasons are factually baseless; (2) the proffered reasons were not the actual motivation for the discharge; or (3) the proffered reasons were insufficient to motivate the discharge." *Wolf v. Buss (Am.) Inc.*, 77 F.3d 914, 919 (7th Cir. 1996); [43] at 10.

Garcia and Keys's decision was not factually baseless (there were two eyewitness accounts substantiating the allegations in question, [41] ¶¶ 14–15), and yelling a racial epithet at another employee while making a threatening gesture is sufficient to justify the taking of an adverse employment action (especially where the employer has an explicit zero-tolerance policy, *see* [46] ¶ 13). Eassa's evidence at most slightly detracts from the rigor of the investigation, but not the genuine belief of the investigators. Even when combined with evidence that suggests Garcia and Keys

knew his race and religion, it is not enough to convince a reasonable jury that the stated reasons were insincere or mere pretext. *See* [43] at 10–11.

The same problems of lack of causation and pretext apply to Eassa's retaliation claim. Both Garcia and Keys were aware of Eassa's prior equal-employment opportunity activity. *See* [41] ¶¶ 11, 13. But again, that is not enough. To survive a motion for summary judgment, the record must "contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused the discharge." *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016) ("[a] retaliation claim requires proof of causation, which in this context means but-for causation").

Eassa's retaliation claim relies on a statement from Thomas Smith, who alleges that Garcia twice admitted to him that the decision to fire Eassa was in retaliation for Eassa "pulling the same things that he did at Irving Park Road." [37] at 199. "A party may not rely on inadmissible hearsay to avoid summary judgment." *MMG Fin. Corp. v. Midwest Amusements Park*, LLC, 630 F.3d 651, 656 (7th Cir. 2011). Eassa says Smith's statement is a business record, but has produced no evidence that the statement was kept in the course of regularly conducted activity or that "making the record was a regular practice of that activity." Fed. R. Evid. 803(6)(B)–(C); *see also* Fed. R. Evid. 902(11). There is no deposition from Smith in the record. Eassa promises that he can present Smith at trial, [43] at 13, but "summary judgment 'is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events."

*Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). Eassa has to point to evidence that is already in the record that would itself be admissible.

Nor does Eassa's retaliation claim succeed under the alternative burden-shifting framework from *McDonnell Douglas*, for many of the same reasons as those that applied to his race-based and religion-based claims. First, a single statement from a supervisor that Eassa was a "good worker" is insufficient to establish that he met his employer's reasonable expectations, especially where there is also evidence that, despite being a "good worker," he violated an express policy and had fought with coworkers in the past. [41] ¶¶ 10, 14–15; [46] ¶ 13. Eassa had to meet all of his employer's legitimate expectations, not just some of them. *See McKinney*, 866 F.3d at 807. Second, Eassa has not produced sufficient evidence of any similarly situated comparators. Promises to do so at trial are, at this stage, insufficient.

The Postal Service is entitled to judgment as a matter of law on Eassa's claims that it discriminated against him in 2016.

### B.    2017 Removal

Eassa has also failed to produce sufficient evidence from which a reasonable jury could conclude that his removal in 2017 was retaliatory. Again, the sole question is whether the record "contain[s] sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused the discharge." *Lord,* 839 F.3d at 563.

Eassa's claim with regards to the 2017 removal relies on another timing argument. *See* [43] at 14–15. Eassa points out that Cobbins and Pouncy sent him a letter notifying him of an upcoming "Pre-Disciplinary interview meeting," *see* [37] at

217, and that Eassa had submitted his complaint about the crotch-grabbing incident to Garcia the day before. [46] ¶ 26. Eassa says that, from this fact (and the inference that Cobbins and Pouncy knew about Eassa's prior protected activity because they worked with Garcia and knew each other), a reasonable jury could conclude that Cobbins and Pouncy took adverse employment action against Eassa because of that previous protected activity.

Eassa's argument assumes that his complaint about the crotch-grabbing incident was what caused Cobbins and Pouncy to schedule the pre-disciplinary interview meeting. But Cobbins noticed Eassa's attendance issues a month earlier, [41] ¶ 42, and attempted to meet with Eassa eight days before Eassa submitted his report to Garcia. *See* [41] ¶ 43. There is no evidence that either Garcia or Cintula (the person to whom Eassa submitted his complaint, *see* [37] at 124, 48:11–13; [46] ¶ 26; at 15–20) ever spoke with Cobbins or Pouncy about Eassa's complaint. Eassa offers no explanation for how they would have known about the complaint that Eassa made the day before. Even if Eassa had provided such an explanation, there was a legitimate reason to send the letter; earlier on the same day the letter was sent, Eassa had refused alternative resolutions to his attendance issues and indicated an unwillingness to participate in further discussions by throwing away the papers on his way out the door. [41] ¶ 45. And even if Eassa's complaint about Ferguson had caused Cobbins to send the letter scheduling his pre-disciplinary interview, a pre-disciplinary interview is not severe enough to constitute an "adverse employment action" in-and-of itself. *See Herrnreiter v. Chicago Hous. Auth.*, 315 F.3d 742, 743–44

(7th Cir. 2002). And since the evidence fails to show that Eassa's protected activity was what caused the pre-disciplinary interview to escalate into removal, it fails to establish the requisite causation.

Considering all of the evidence together, no reasonable jury could conclude that Eassa's 2017 removal was because of protected activity, at least in part because—by Eassa's own admission—he had violated one of the Postal Service's express attendance policies. [41] ¶ 41. And again, "Eassa is not aware of any similarly situated employee who was treated differently than him regarding attendance discipline," [41] ¶ 62, nor can he show that the stated reason was pretextual. His claim fails for both of those reasons, too. *Lewis*, 909 F.3d at 871.

The Postal Service is entitled to judgment as a matter of law on Eassa's claims that it retaliated against him when it removed him from work in 2017.

### C. Other Actions in 2017

Lastly, Eassa has failed to produce sufficient evidence from which a reasonable jury could conclude that any of the additional actions alleged to have taken place in 2017 were materially adverse or motivated by discriminatory animus. Eassa identifies six harms that he suffered that he says, in their aggregate, amounted to an adverse employment action. [43] at 16–17 (citing *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1060 (8th Cir. 1997) (adverse action found where "all the [defendant's] acts were taken in response to [plaintiff's] filing the employment discrimination charge and were thus connected to one another"); *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) ("the alleged acts of retaliation need to be considered both separately and in

the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable")). *But see Lewis,* 909 F.3d at 868 (three incidents of agency administrative failures were "isolated events" that "represent the kind of minor workplace grievances against which Title VII does not protect").

According to Eassa, "he was denied medical insurance, prohibited from bidding on tours and routes, was denied pay for coming to work for his DOT physical exams and driving test, had his medical status posted in a place visible to employees . . and had his complaint against Ferguson regarding the latter's disturbing sexual taunt ignored." [43] at 16–17. But as the Postal Service points out, upon closer examination, these harms are insignificant, separately and in the aggregate. Eassa temporarily did not have health insurance because he had recently returned to work and his insurance was not yet effective. [41] ¶ 54. He was not able to bid because he had been away from work for more than a year and was in any event allowed to keep the same schedule he had when he left the Postal Service. [41] ¶ 55. He admits he was paid for coming to work for his physical exams and driving test and that no one at the Postal Service did anything wrong in connection with the payment. [41] ¶ 53. Ferguson's taunt was in fact investigated. *See* [46] at 15–16. The note that was left for Eassa about his medical documentation does not disclose any harmful or embarrassing information about Eassa, beyond the facts that (1) he was absent at some point earlier, and (2) that he needed medical documentation to be absent. [37] at 228. It was not sufficiently harmful to him to constitute an adverse action, alone or in combination with the other evidence he has submitted. *See Herrnreiter*, 315 F.3d

at 743–44. These minor inconveniences do not amount to retaliatory actions that "might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

The Postal Service is entitled to judgment as a matter of law on Eassa's claims that these various inconveniences in 2017 were actionable under Title VII.

## IV. Conclusion

Defendant Brennan's motion for summary judgment, [35], is granted. Enter judgment and terminate civil case.


ENTER:

Manish S. Shah
United States District Judge

Date: February 12, 2019